512 So.2d 645 (1987)
Ilar W. OSBORNE, Jr., Plaintiff-Appellee,
v.
Pinkie Lea Humphries OSBORNE, Defendant-Appellant.
No. 18901-CA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1987.
*646 Bruscato, Loomis & Street by Albert E. Loomis, III, Monroe, for defendant-appellant.
Voelker, Ragland & Crigler by James C. Crigler, Jr., Lake Providence, for plaintiff-appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
MARVIN, Judge.
The mother appeals a 1986 child support judgment that ordered the father to pay monthly for his 13-year-old daughter in the mother's residential custody, medical insurance premiums, one-half of the cost of orthodontic treatment ($37.50), and $200 to defray, in part, the costs of supporting the daughter. The residential custody of the 10-year-old son of the marriage was awarded to the father, who bears the total support obligation for the son.
The mother and father effectively agreed in 1985 when the judgments of separation and divorce were rendered that he would contribute an amount to the daughter's monthly support, but stipulated in each instance that the daughter's monthly support would not be deemed to be a considered decree but would be litigated after the parents settled their community claims against each other. Following a 1986 community settlement, the daughter's monthly support was litigated on rules filed by each parent to modify.
The mother contends that the trial court erred in reducing the father's support contribution to the daughter from $750 to $200, an amount which would require the mother to deplete her capital assets. She also seeks to have this court amend the judgment or direct the trial court to order the father to accede to the desire of the mother and daughter that the daughter attend the Methodist church with the family of her maternal aunt when the daughter visits her father and brother one weekend a month as decreed by the custody order.
We find no error or abuse of discretion and affirm the judgment.

FACTS
The trial court's written reasons detailed the procedural and factual circumstances:
The parties ... were separated by judgment of ... May 7, 1985, ... based on the abandonment of ... Ilar W. Osborne, Jr. by ... Pinkie Lee Humphries Osborne....
The parties were divorced by judgment of ... December 5, 1985. This judgment continued joint custody of the children, with the exception that residential custody of the son ... continued with [Mr. Osborne and] residential custody of the daughter ... [was] awarded [Mrs. Osborne]. *647 The judgment provides for the payment of the sum of [$500] per month by [Mr. Osborne] to [Mrs. Osborne] commencing December 1, 1985, until execution of a community property settlement agreement ... to be credited to [her] one-half portion of the community property... The judgment further stipulated that [Mr. Osborne] was to pay [$750] for the support of the [daughter], together with maintenance of hospitalization insurance. * * *
[T]he language of the judgment clearly indicates that the figure of [$750] per month set as child support was an interim figure with which neither party was satisfied, and apparently both parties felt that it should be litigated only after the community property settlement was effected.
In August 1986, about a month after the community property settlement, Mr. Osborne sought to reduce child support, asking that the parties each be responsible only for the support of the child in their respective custody. Mrs. Osborne sought to increase child support to $1,250 per month, plus payment of all hospitalization insurance and half of all medical and dental bills not covered by insurance. She also asked that Mr. Osborne be responsible for transporting the children between his home in Tallulah and her home in Pineville for their visitation with the other parent, and that he be ordered to let Lee Evelyn, the daughter, attend a Methodist church rather than his Baptist church during her visits with him.
The trial court found that the parties should continue to bear the transportation responsibilities equally and that Lee Evelyn's church attendance was a matter of parental authority during her once-a-month weekend visit with her father. Lee Evelyn's child support payments were fixed at $200 per month and Mr. Osborne was ordered to pay monthly premiums for her hospitalization and medical insurance and one-half of the payments for her orthodontic treatment.
Before answering the mother's contentions, we note the potential conflict between pertinent case law and legislation, whether the showing of a change in circumstances that is required to modify child support may be waived. LSA-R.S. 9:311.

CHANGE IN CIRCUMSTANCES
In the judgment of divorce dated December 5, 1985, the parties stipulated that Mr. Osborne would maintain hospitalization insurance and would pay Mrs. Osborne $750 per month child support, and that "said awards of child support [are] to be in no way deemed a considered decree with the express understanding that both parties are expected to litigate the issue of child support within thirty (30) days of execution of the community property settlement agreement ..."
The parents and the court below proceeded on the premise that the stipulation relieved the parents of showing a change in circumstances. Nevertheless, the parties alleged and the court found that some substantial changes in circumstances had occurred since the December 1985 judgment, particularly as a result of the community property settlement which increased Mr. Osborne's debts and Mrs. Osborne's liquid assets.
Ordinarily, even a consent judgment fixing child support may not be modified absent a showing of a substantial change in circumstances to support the modification. Updegraff v. Updegraff, 421 So.2d 1165 (La.App. 2d Cir.1982). Aldredge v. Aldredge, 477 So.2d 73 (La.1985), recognized that an express and unequivocal waiver could be made as an exception to the requirement of proving a change in circumstances. The court observed that the requirement of showing a change in circumstances had been created by case law and found that a waiver of that requirement did not violate the Civil Code or public policy.
Although Aldredge was not cited, the trial court's finding that the parties intended and were entitled to have a res nova hearing on child support after the community property settlement is in accord with Aldredge.
*648 Aldredge was rendered on October 21, 1985, shortly before the Osbornes made the stipulation in the December divorce judgment. By Act No. 41 of 1985, effective September 6, 1985, the legislature provided in part in LSA-R.S. 9:311(A):
An award for support shall not be reduced or increased unless the party seeking the reduction or increase shows a change in circumstances of one of the parties between the time of the previous award and the time of the motion for modification of the award.
We concur in the trial court's finding that a change in circumstances was shown and do not consider whether the quoted statute precludes a waiver of the requirement as the parties intended and as Aldredge upholds.

AMOUNT OF CHILD SUPPORT
[3] Both parents are obligated to contribute to the support of children in proportion to the needs of the children and the circumstances of each parent. CC Arts. 227, 231. If finances permit, the children are entitled to the same standard of living which they enjoyed before the marriage ended. Ducote v. Ducote, 339 So.2d 835 (La.1976); Miller v. Miller, 475 So.2d 40 (La.App. 2d Cir.1985).
A parent's day-to-day care of a child is a substantial contribution to the support obligation. Ducote, supra; Chaffee v. Chaffee, 398 So.2d 1169 (La.App. 2d Cir. 1981). If the parents contribute equally in day-to-day care, their financial support obligations must be borne in proportion to their ability to pay. See Hendrick v. Hendrick, 470 So.2d 449 (La.App. 1st Cir.1985), and Strickland v. Strickland, 377 So.2d 537 (La.App. 3d Cir.1979).
The trial court has much discretion in fixing child support and its award will not be disturbed on appeal unless the record reveals an abuse of discretion. Sims v. Sims, 457 So.2d 163 (La.App. 2d Cir.1984).
In this case, the parents' nonmonetary contributions toward supporting each child are deemed to be equal because Lance, the son, lives with Mr. Osborne and Lee Evelyn lives with Mrs. Osborne. After thoroughly reviewing the details of each parent's financial circumstances, the trial court found that the father should bear more of the cost of caring for the children than the mother and ordered the father to pay $200 per month, plus hospitalization and medical insurance premiums for Lee Evelyn and one-half of the cost of her braces. Mrs. Osborne asks that the $200 award be increased to $1,250 per month, or that the award be maintained at $750 per month.
The record supports the conclusions that neither party was "satisfied" with $750 stipulated support award in the divorce judgment and that the community property settlement changed the financial circumstances of both parents.

FINANCES
Mr. Osborne owns a 92.5 percent interest in Osborne Ford-Lincoln-Mercury, Inc., a family-owned dealership in Tallulah. The trial court found Mr. Osborne's monthly income to be $4,310 gross and $3,368 net. Based on the father's list of expenses for himself and Lance, which did not include the child support payment for Lee Evelyn, the court found his monthly expenses to be $3,901, leaving him with a negative cash flow of over $500 per month.
Mrs. Osborne points out that Mr. Osborne contributes $400 per month to his church. Although the trial court did not attribute any of this expense to Lance, this contribution was considered as a part of Mr. Osborne's expenses to reach the conclusion that his expenses exceeded his net income by $533.
Large sums listed as church tithes have not been allowed by this court as necessary expenses of permanent alimony claimants. See Meyers v. Meyers, 344 So.2d 451 (La.App. 2d Cir.1977), and Harlow v. Harlow, 471 So.2d 895 (La.App. 2d Cir.1985). We see no reason to treat a contribution to a church differently for a child support obligor. Mr. Osborne's contribution to his church of $400 per month should not have been considered as a necessary *649 expense of his. When it is excluded, his monthly deficit is $133. This exclusion, however, does not change the result.
In the community property settlement, Mr. Osborne received the 5,000-square-foot family home valued at $125,000 and some of its furnishings; a vacant lot of undisclosed value; and four pieces of rental property with a combined value of about $60,000, for which he itemized expenses in excess of the rental income. He also received $6,000 in IRA's; a coin collection worth about $2,000; stock in some defunct corporations with an estimated net value of not more than $5,000; and $30,000 worth of stock in a family corporation which owns the building that houses the car dealership. He received 480 shares of Osborne Ford-Lincoln-Mercury, Inc. stock in the community property settlement. He owned an additional 260 shares as his separate property. He estimated the total value of the 740 shares of stock to be about $350,000.
In the property settlement, Mr. Osborne assumed about $294,000 in community debts. He borrowed an additional $105,000 which he paid to Mrs. Osborne in the settlement, and obligated himself to pay her another $50,000 in $10,000 annual installments for five years beginning in July 1987.
Mrs. Osborne also received about $32,000 as her share of the proceeds from the liquidation of a tire store business; about $36,000 in jewelry and household furnishings; two $2,300 IRA's; two life insurance policies with cash surrender values totaling about $3,000; and a tract of farmland valued at $25,000. She gave up her interest in Mr. Osborne's pension and profit sharing plans. She assumed no appreciable community debts.
Mrs. Osborne's income from the farmland ($1,400 paid annually) is about $117 per month. Her monthly income from $95,000 in certificates of deposit is $482. She used the rest of the cash received from the property settlement for litigation and living expenses, and purchased a $21,000 sports car. Before the settlement she had been allowed the use of a car owed by the Osborne dealership.
Mrs. Osborne, who was decreed to be at fault in the separation proceeding, receives no permanent alimony. She was seeking a job at the time of trial. She had two years of college before she married and worked for a total of about one year during the 13-year existence of the marriage. One of her jobs was at a radio station for which she was paid $900 per month. She commuted from Tallulah to Jackson, Mississippi, for less than a month in 1986 to do cosmetic promotions in a department store, from which she grossed $800. She turned down two job offers after moving to Pineville, one at a radio station and the other at a car dealership.
Mrs. Osborne argues that Mr. Osborne concealed his true financial circumstances during the litigation by increasing his debts and reducing his income from the corporation in which he has a controlling interest.
Much of the increased debt was incurred in order to enable Mr. Osborne to make the $105,000 cash payment to Mrs. Osborne in the settlement. About half of that amount came from bank loans secured by second mortgages on the family home and the rental property. The other half was loaned to Mr. Osborne by his mother. He did not list as expenses any principal or interest payments on this amount or on the substantial loans his mother made to benefit Mr. and Mrs. Osborne during their marriage.
Notwithstanding extensive cross-examination about the business finances, the record supports the trial court's finding that the evidence simply does not show any improper business conduct on Mr. Osborne's part. The figure used for Mr. Osborne's monthly income from the car dealership was based on a five-year average of salary and bonus payments. The yearly fluctuation corresponds to the pattern of changes in the dealership's sales and taxable income. Although the dealership received an award from Ford Motor Company for achievement in sound management, warranty control and market share, its sales volume had dropped to slightly above half what it had been in 1979. Mr. Osborne testified that economic conditions in *650 rural Madison Parish affected the dealership's business.
Mrs. Osborne emphasizes that the dealership provides Mr. Osborne with a car and pays for his gasoline and insurance. She contends these items represent additional "income" to him. These items were not included in his lists of income or expenses. Even if we assume that Mr. Osborne's use of the car might constitute taxable income to him, the tax that he may be required to pay would constitute a personal expense to him.
Mrs. Osborne asserts, somewhat erroneously, that Mr. Osborne pays $1,500 per year for a hunting club membership and provides his wealthy mother with a car. The record reflects that these items are paid for by the corporate dealership, not by Mr. Osborne personally. He and his son enjoy the use of the hunting club membership which he, correctly we add, does not list as an expense for either of them. Mr. Osborne testified that before his father's death, he promised his father that his mother would be furnished with a car when he acquired the controlling interest in the dealership. Any income which might be attributable to him because of this is probably inconsequential when we consider that the dealership is and has been a family corporation and that the substantial loans his mother made over the years benefited Mr. and Mrs. Osborne.
Mr. Osborne received an income tax refund of about $6,500 in 1986 which was not listed as income. He explained that he paid debts such as interest on loans and attorney fees with the refund.
Mrs. Osborne asserts that Mr. Osborne owns an "expensive" Rolex watch and some Persian rugs. She owns a Rolex watch and many valuable home furnishings that are reflected in the community property settlement. She pays $50 per month to store the furnishings that her apartment will not hold.
Except for the one adjustment for the $400 contribution Mr. Osborne makes to his church, we shall not disturb the trial court's detailed findings and conclusions as to the income and expenses of the parties.
Although Mr. Osborne's monthly income exceeds that of Mrs. Osborne, the trial court properly considered Mr. Osborne's increased debt (totaling about $450,000) and Mrs. Osborne's assets from the community property settlement (including the $10,000 annual installments for five years) as relevant to the ability of each parent to support their daughter.
When apportioning the mutual child support obligation between the parents, the court may consider and order payment from either or both the assets and the income of each parent. Sanders v. Sanders, 250 La. 588, 197 So.2d 635 (1967); Fellows v. Fellows, 267 So.2d 572 (La.App. 3d Cir.1972).
Although permanent alimony is not an issue, the case law on depletion of assets by permanent alimony claimants is persuasive because both assets and income are considered pertinent to the alimentary obligation, whether child support or alimony. See Frederic v. Frederic, 302 So.2d 903 (La.1974).
A support claimant is not required to sell his or her home or deplete assets entirely, but may be required to deplete liquid assets to some extent, before being entitled to receive support payments. See and compare Sonfield v. Deluca, 385 So.2d 232 (La.1980), and cases cited therein; Whipple v. Smith, 428 So.2d 1114 (La.App. 1st Cir.1983), writ denied, 433 So.2d 154 (La.1983); Darbonne v. Darbonne, 427 So.2d 558 (La.App. 3d Cir.1983); and Duplantis v. Duplantis, 470 So.2d 480 (La. App. 1st Cir.1985).
There cannot be an exact formula or rule for deciding whether and to what extent any depletion of assets is required of a support claimant. Courts must apply a "rule of reasonableness" in light of such factors as the value and liquidity of the assets; the ages and the mental and physical health of the parties; their other financial responsibilities; their relative ability, education and work experience; and the potential effect of asset depletion on the *651 children of the marriage. Loyacano v. Loyacano, 358 So.2d 304 (La.1978).
Mrs. Osborne received over $135,000 in cash from the community property settlement. Even with allowances for inflation, this is substantially more than the $27,300 in cash proceeds of the community property settlement received by the wife in Garrett v. Garrett, 229 So.2d 213 (La.App. 2d Cir.1969), which was found to be sufficient for her maintenance.
Had the settlement agreement provided that Mrs. Osborne receive all, instead of some, of the cash in installment payments, the installments would constitute a liquid asset relevant to her support obligation. See Duplantis, supra. We cannot assume that Mr. Osborne defaulted in his obligation to pay Mrs. Osborne $10,000 a year for five years beginning in July 1987.
Although Mr. Osborne clearly has more work experience and ability to earn than Mrs. Osborne, he also has considerably more debt. Mrs. Osborne benefited directly or indirectly from the proceeds of many of the loans. She benefits from his assumption of all community debts. The trial court properly distinguished Mr. Osborne from other child support obligors who unilaterally incur debt and use that debt to seek a reduction of their support obligation.
Even if Mrs. Osborne's efforts to obtain employment are not successful, she will receive $10,000 per year from Mr. Osborne as part of the property settlement during the remaining five years of Lee Evelyn's minority. Mrs. Osborne's income in the five-year period beginning July 1987 will be more than $17,000 a year.
Mr. Osborne's primary assets are the family home and his interest in the car dealership. Although the home is quite large, it was acquired during the marriage and is being used as security for some of Mr. Osborne's debts. He and his son live there. He should not be required to sell the family home in order to raise capital. See Sonfield v. Deluca, supra.
The trial court noted that any extraction of working capital from the dealership by Mr. Osborne to meet Mrs. Osborne's demands for child support would be analogous to "kill[ing] the goose that lays the golden egg." The same could be said of requiring him to sell some of the majority stock he owns in the family corporation.
In Smith v. Smith, 217 La. 646, 47 So.2d 32 (1950), the wife's $20,000 share of the community assets, consisting mainly of bonds and interest-bearing notes, was found to preclude her from receiving permanent alimony. This portion of that opinion is pertinent:
How far she should go in depleting her capital presents another question. Whilst we do not think that she should be made to use it all, on the other hand, we do not believe that the law intends that she can maintain it intact. In this case, what capital the wife has was derived from the partition of the community [property] and were she permitted to retain hers and at the same time cause her husband to deplete his, in order to pay her alimony, that would produce a result which would be highly inequitable and a situation by which he could be forced into the obligation of supporting her when that obligation no longer exists by reason of the dissolution of the marriage.
Mr. Osborne has child support obligations after the divorce, but he no longer has the obligation to support Mrs. Osborne. Mrs. Osborne has child support obligations as well as the obligation to support herself. The trial court observed that she "seems to overlook completely the fact that [Mr. Osborne] is supporting the other child of the marriage." The trial court correctly found Mrs. Osborne as well as Mr. Osborne to be responsible for some of the cost of Lee Evelyn's support.
The trial court attributed to each respective child 1/3 of the custodial parent's expenses for items which benefit both that parent and the child, such as food and housing, and all of the expenses solely for the child's benefit, such as school-related items and piano lessons for both children. The court attributed 1/3 rather than ½ of the joint expenses to the child, stating that *652 "it cannot be said that a person's expenses are exactly reduced by one-half without a child residing with them."
The court calculated the monthly expenses for Lance as $786 and for Lee Evelyn as $870. These figures total $1,656. The court then calculated Mr. Osborne's share as $1,003 by adding all of Lance's expenses and ¼ of Lee Evelyn's expenses ($786 plus $217). The monthly payment for Lee Evelyn's support was set at $200 rather than $217 because of Mr. Osborne's responsibility for half the cost of her orthodontic braces. Because the $75 per month orthodontic expense was handled separately in the judgment and was divided equally between the parents, the trial court did not include that expense in the $870 total for Lee Evelyn's expenses.
Mrs. Osborne contends that ½ rather than 1/3 of the joint expenses should have been attributed to Lee Evelyn.
The difficulty of determining precisely how the joint household expenses are to be apportioned between the parent and the child has been noted. Fall v. Fontenot, 307 So.2d 779 (La.App. 3d Cir.1975). In some cases, the expenses have been apportioned on a pro-rata basis according to the number of people in the household. See Griffin v. Griffin, 316 So.2d 870 (La.App. 2d Cir.1975); Dufrene v. Dufrene, 430 So.2d 759 (La.App. 5th Cir.1983); and Lagrone v. Lagrone, 499 So.2d 1120 (La.App. 3d Cir.1986). Other cases have found a pro-rata division inappropriate. See Marcus v. Burnett, 282 So.2d 122 (La.1973); Chaffee v. Chaffee, supra; and Bettencourtt v. Bettencourtt, 407 So.2d 804 (La. App. 4th Cir.1981).
The trial court directly attributed $300 of the daughter's total monthly expense of $870 to her cost for school, beauty shop, and private lessons. The trial court directly attributed $205 of the son's total monthly expense of $786 to his cost for school and private piano lessons. If these direct expenses alone are considered in the light of the father's decreed obligation (all of the son's expense and $200 of the daughter's) he is paying $405 of the $505 total direct expense, or about 80 percent.
If the respective household expenses are apportioned one-third to each child, as the trial court did, the father is paying 60 percent of the total expenses for both children ($986/$1,656). If the respective household expenses were apportioned one-half to each child, as the mother argues, the father's decreed obligation ($1,077 for the son and $200 for the daughter) would amount to 57 percent of the total expenses for the two children.
The trial court said:
Under the ... circumstances ... this court feels that the father should bear somewhat more of the burden of caring for these children than the mother. A reasonable difference would be that the burden of the father should be approximately one-fourth greater than that being borne by the mother. The total child expense calculated by this court is [$1,656.00], from the list submitted by the parties. Mathematical calculation of the burden of the father at one-fourth greater than the mother would indicate a monthly responsibility by the father of [$1,003.00]. Since he already bears the cost of the son of [$786.00], this would require that his payment to the mother be assessed at [$217.00] per month.
The court notes from the record that the father supplies health insurance for the daughter. The record does not indicate that this insurance includes dental care. The mother testified that the daughter now has braces and that the mother has incurred an obligation for this care which will require that she pay [$75.00] per month to a dentist for the remainder of the contract. The court therefore feels that an overall equitable arrangement will be for the father to pay the sum of [$200.00] per month to the mother plus one-half of future payments to the dentist over the remainder of the life of the contract for braces.... It should be noted that Defendant has requested that Plaintiff pay all dental and medical bills not covered by the health insurance. However, Defendant included an amount of [$50.00] for medical and dental expenses for herself and the child.

*653 It appears that the dental braces were not included in that estimate so the court will include the braces only in its award.
Under the detailed circumstances found by the trial court and supported by the record, we cannot say that the trial court abused its discretion in its apportionment of the household expenses between the mother and daughter or in ordering the father to contribute only $200 toward the support of the daughter. A support award may be modified as the circumstances warrant and the children are not forever relegated to an amount that may have been fixed by a court at any one time. At this juncture, we shall affirm the trial court.

CHURCH ATTENDANCE
Lee Evelyn attended the Baptist church until she was 11 or 12 years old. She then expressed an interest in the Methodist church, which her mother and her mother's family attended, and was allowed to become a member of the Methodist church after taking a confirmation class. Both parents supported her in that decision.
Lee Evelyn was 13 years old at the time of trial. She and her mother testified that she desired to attend the Methodist church with the family of the mother's sister when she visited her father in Tallulah. Her father testified that he had no objection to her choice of religion, but that he desired her to attend the Baptist church with him and her brother Lance when she visited them. Because she spends only one weekend of each month with them and she must be allowed travel time to and from Tallulah and Pineville, her father reasons that having her go to church with her aunt's family on Sunday morning interferes too much with his visitation time. Both parents testified that the daughter had never asked her father if she could attend the Methodist church during her visits.
The trial court found that the father was not attempting to force any religion upon Lee Evelyn, noting that she is under the care and control of her father during their weekend visit. The court viewed the choice of a church as a decision more suitable for parental than for court determination. Under the recited circumstances and noting that Lee Evelyn had not made a direct request to her father on any weekend visit, we find no error.

DECREE
For reasons assigned below, as here summarized and supplemented, and at appellant's cost, we AFFIRM.